IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MELINDA EBEL, | ) | Bankruptcy Case No. 05-42646 |
| KATHLEEN SCHEEL, | ) | Bankruptcy Case No. 06-40653 |
| ANTHONY CHAMBLISS, | ) | Bankruptcy Case No. 06-40802 |
| JOHNSON'S SIDING & | ) | |
| REPLACEMENT WINDOWS, INC., | ) | Bankruptcy Case No. 06-41008 |
| CHARLES BURNHAM and | ) | |
| KIMBERLY BURNHAM, | ) | Bankruptcy Case No. 06-41087 |
| | ) | |
| Debtors. | ) | Chapter 7 |

OPINION

These matters having come before the Court on a Rule to Show Cause and Response of William Wells and Financial Services Law Practice, P.C., to Order to Show Cause; the Court, having heard arguments of counsel and having reviewed the record of these proceedings and the written memoranda of the parties, makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The authority of this Court to control admission to its bar and to discipline attorneys who appear before it is well settled. Pursuant to Rule 9029.1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Illinois, rules governing practice and procedure in all cases in proceedings within the United States District Court's bankruptcy jurisdiction were adopted by unanimous action of the Judges of the United States District Court. Under Local Rule 1001.1, the United States District Court stated that it was the intention of that Court that the Bankruptcy Judges be given the broadest possible authority to administer cases properly within their jurisdiction, and that Rule 1001.1 was to be interpreted to achieve that end. The Local Rules of the United States District Court for the Southern District of Illinois are also applicable to bankruptcy proceedings, and, pursuant to Rule 83.4 of the United States District Court Rules, the Standards of Professional Conduct are those Rules of Professional Conduct adopted by the Supreme Court of Illinois. The

Bankruptcy Court has specifically adopted the Local Rules of the Southern District of Illinois by virtue of Rule 1001.2 of the local bankruptcy rules.

Rule 1.1(a) of the Rules of Professional Conduct adopted by the Supreme Court of Illinois states:

> A lawyer shall provide competent representation of a client.  Competent representation requires the legal knowledge, skill, thoroughness, and preparation necessary for the representation.

Rule 1.5(a) states:

> A lawyer's fee shall be reasonable.

Rule 2.1 states:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice.  In rendering advice, a lawyer may refer not only to law but to other considerations, such as moral, economic, social and political factors that may be relevant to the client's situation.

Rule 5.1(a) states:

> Each partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the conduct of all lawyers in the firm conforms to these Rules.

Rule 8.4(a)(4) states:

> A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

Further, Illinois Supreme Court Rule 771 is violated when a lawyer engages in conduct which tends to defeat the administration of justice, or to bring the courts or the legal profession into disrepute.

This Court does have the authority to suspend an attorney from practicing before it. This authority comes from three sources:  inherent authority, statutory authority, and local rules.  See:  In re Disciplinary Proceedings, 282 B.R. 79 (1st Cir. BAP 2002).  The First Circuit Bankruptcy Appellate Panel in In re Disciplinary Proceedings, stated:

> As a federal court, a bankruptcy court has the inherent power to sanction, by suspension or disbarment, any attorney who appears before it.  *See generally Peugeot*, 192 B.R. at 970; *see also Cunningham v. Ayers (In re Johnson)*, 921 F.2d 585, 586 (5th Cir. 1991) (recognizing that bankruptcy judges may

discipline lawyers in the context of both contempt and disciplinary proceedings).

The United States Supreme Court in <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 11 S.Ct. 2123 (1991), held that a federal court has the inherent power to control admission to its bar and to discipline attorneys before it. A Bankruptcy Court not only has the authority to discipline an attorney for misconduct, but it also has the responsibility to take action in order to protect the integrity of the Court, its bar, and the public from such misconduct. <u>In re Derryberry</u>, 72 B.R. 874 (Bankr. N.D. Ohio 1987). <u>See also</u>: <u>In re Computer Dynamics, Inc.</u>, 253 B.R. 693 (E.D. Va. 2000).

In addition, to this Court's inherent authority to discipline attorneys who practice before it, the Court also has statutory authority pursuant to 11 U.S.C. § 105(a). In <u>In re Disciplinary Proceedings</u>, <u>supra</u>, at 86, the Court stated that Section 105(a) of the Bankruptcy Code:

> . . . empowers a bankruptcy court to sanction and otherwise discipline attorneys who appear before it, given that incompetent attorneys frustrate the Bankruptcy Code's purpose of prompt administration of the estate and equitable distribution of assets.

Section 105(a) has been used on many occasions to deny attorneys the privilege of practicing before a Court. <u>See</u>: <u>In re MPM Enterprises, Inc.</u>, 231 B.R. 500 (E.D. N.Y. 1999); <u>In re Gunn</u>, 171 B.R. 517 (Bankr. E.D. Pa. 1994); and <u>In re Computer Dynamics, Inc.</u>, <u>supra</u>, at 698.

The "process" which is often used under Section 105(a) to carry out the provisions of the Bankruptcy Code is "Civil Contempt." <u>In re Computer Dynamics, Inc.</u>, <u>supra</u>, at 699. Pursuant to the civil contempt power, Bankruptcy Courts can suspend an attorney from the practice of law. <u>See</u>: <u>In re Assaf</u>, 119 B.R. 465 (Bankr. E.D. Pa. 1990). The Seventh Circuit has upheld Bankruptcy Courts decisions to impose sanctions and make findings of civil contempt. <u>In re Hancock</u>, 192 F.3d 1083 (7th Cir. 1999); and <u>In re Maurice</u>, 69 F.3d 830 (7th Cir. 1995). Additional cases support the authority of Bankruptcy Courts to suspend or

disbar an attorney as a sanction for contempt are:  <u>D. H. Overmyer Co., Inc.</u>, 750 F.2d 31 (6th Cir. 1984); <u>In re Pearson</u>, 108 B.R. 804 (Bankr. S.D. Fla. 1989); <u>In re Heard</u>, 106 B.R. 481 (Bankr. N.D. Ohio 1989); <u>In re Nesom</u>, 76 B.R. 101 (Bankr. N.D. Texas 1987); <u>In re Derryberry</u>, <u>supra</u>, at 876-886; <u>In re Printree, Ltd.</u>, 40 B.R. 131 (Bankr. S.D. N.Y. 1984); and <u>In re Lowe</u>, 18 B.R. 26 (Bankr. N.D. Ga. 1982).

As set out above, the United States Bankruptcy Court for the Southern District of Illinois is governed by the rules of the United States District Court for the Southern District of Illinois.  Attorney discipline is governed by Rule 83.4 of those rules, making applicable the Standards of Professional Conduct adopted by the Supreme Court of Illinois.  Evidence presented at numerous hearings on William Wells' cases and the records of proceedings in those cases clearly demonstrate that Attorney Wells is in violation of the Rules of Professional Conduct, and that those violations are so egregious in their nature to require that he be suspended from practice before the United States Bankruptcy Court for the Southern District of Illinois.

On June 22, 2007, the Court held a hearing on the Rule to Show Cause, in which Wells was ordered to personally appear.  Counsel for Wells, Spencer Desai, appeared, but Wells did not.  Even though Wells was represented by counsel, he chose to file a Motion for Continuance of the June 22, hearing on his own.  Wells' Motion for Continuance was filed after regular Court hours, and the Court was not even aware of the Motion until shortly before the scheduled hearing.  The Court found on the record that the Motion was not timely and that the excuse of illness offered by Wells was not credible.  The Court further noted on the record that, while Wells claimed to be too ill to appear in Court, he continued to file new cases.  He had, in fact, filed new cases, in which he had collected advance fees, the day before the hearing and earlier the morning of the hearing.  The hearing was held in Wells' absence without objection from Spencer Desai.

At hearing, the United States Trustee's Office, through Attorney Mark Skaggs, outlined for the record its Brief and Memorandum of Law in support of suspending Attorney Wells from practicing in Bankruptcy Court, which had previously been filed on June 14, 2007. Mark Skaggs asserted that the facts presented as to the captioned cases and others provided a sound basis for the entry of an order suspending Wells from practice before the Bankruptcy Court for the Southern District of Illinois. Also, in support of suspending Attorney Wells, Chapter 7 Trustees Dana Frazier and Laura Grandy proffered facts and argument supporting and supplementing the facts and argument made by the United States Trustee.

In response to the position taken by the United States Trustee and the attending Case Trustees, Spencer Desai indicated that there was no significant contest as to the facts outlined in the United States Trustee's Brief and the facts proffered by Trustee Frazier and Trustee Grandy. However, Spencer Desai argued that, regardless of the largely undisputed facts, this Court lacked authority and jurisdiction to enter an order suspending Wells from practice before it. This argument is without merit given the well-settled state of the law as outlined above. Thus, the Court finds that it is able to render a decision based upon the facts outlined by the United States Trustee's Office in its Brief, the facts proffered by Trustee Frazier and Trustee Grandy, and a review of the record of the captioned cases and numerous other cases wherein Wells and/or his law firm, Financial Services Law Practice, PC, are scheduled as debtors' counsel of record.

In addition to his legal representation of debtors in Chapter 7 and Chapter 13 bankruptcy cases before this Court, Wells holds himself and his firm, Financial Services Law Practice, PC, out as a debt negotiation service. This fact is evidenced by an advertisement found on Page 3D of the publicly circulated newspaper, "The Southern Illinoisan," published

on Saturday, July 7, 2007.[1]  This advertisement indicates that William E. Wells is an attorney licensed in Illinois and that the firm has associates that are licensed in Missouri, Indiana, and Kentucky.  The Court finds it curious that the advertisement makes this claim, given Wells statement on the record before the Court on April 16, 2007, that, as of that date, he was the only licensed attorney working in the firm.  This discrepancy can only be explained in one of two ways.  Either, (1) that Wells has hired new associates since April 16, 2007, or, (2) that the statement is false.  Resolution of this discrepancy is not critical to the Court's ruling on the material issues before it; however, the Court must note that the only evidence on the record in these matters belies the existence of any associate attorneys, let alone associates licensed in Missouri, Indiana, and Kentucky.

Each of the above-captioned cases were previously before the Court for consideration of the reasonableness of attorney fees charged and collected by Wells and his firm as bankruptcy counsel and for debt negotiation services he and/or his firm provided for the Debtors.  In each of the captioned cases, the Debtors entered into a contract wherein Wells and/or his firm would attempt to negotiate a reduced payment of the Debtors' obligations directly with the creditors in an attempt to avoid filing for bankruptcy relief.  The Debtors paid an up-front fee to Wells and/or his firm with the proviso that no further fees would be charged for filing a bankruptcy petition in the event debt negotiation failed. In each of the captioned cases, debt negotiations attempted by Wells and/or his firm failed to reduce the debt to a level that allowed the Debtors to avoid filing for bankruptcy relief, resulting in the filing of the instant proceedings by Wells and/or his firm on behalf of the Debtors.

In the interest of clarity and brevity, the Court will discuss the material facts of the main cases in this matter in the order that they appear in the caption.  This discussion will be

---

[1]    This July 7, 2007, advertisement was published despite the fact that, on June 22, 2007, William E. Wells was ordered not to file any new bankruptcy cases pending further order of this Court.

followed by further examples of Wells' unacceptable conduct and practice in representing debtors before this Court.

### Melinda Ebel, Case No. 05-42646

William Wells, through his firm, filed a Chapter 7 bankruptcy petition on behalf of Melinda Ebel, on September 23, 2005. In his initial Rule 2016(b) fee disclosure, filed with the original Chapter 7 petition, Wells disclosed that he had received only $399 for representation of the Debtor. In the process of administering Debtor's Chapter 7 estate, Trustee Dana Frazier discovered that, in fact, Wells had been paid the sum of $1,575 for debt negotiation services prior to the Chapter 7 filing. There was no successful debt negotiation, and a Chapter 7 petition was filed. Wells was directed to file an amended disclosure of compensation, which he submitted on October 24, 2006, this time indicating that he had received no fee for the filing of the Debtor's Chapter 7 petition. It was also discovered in this case that a pleading filed by Wells' firm, which appeared to contain the electronic signature of the Debtor, had not been authorized by the Debtor; and that, at the time the particular document had been allegedly signed by the Debtor, the Debtor had already terminated the employment of Wells and his firm as her attorneys in this case. The Chapter 7 Trustee filed a Motion for Determination of Reasonable Value of Services Rendered and a Motion for Sanctions seeking a disgorgement of fees in excess of the value of the services performed by Wells and his firm. Hearings were held on both the Motion regarding fees and the Motion for sanctions, resulting in an Order entered by the Court on January 22, 2007, directing Financial Services Law Practice, PC, to disgorge all monies received from Debtor Ebel, and to pay the bankruptcy estate the sum of $1,575 within 30 days of the date of the Order. The Court further ordered that any agreement for compensation which existed between Melinda Ebel and Financial Services Law Practice, PC, is canceled and that all matters would be referred to the United States Trustee's Office and the Illinois Attorney Registration and Disciplinary Committee. As an additional sanction for submitting a document not authorized

to be signed by the Debtor, the Court entered an Order on April 19, 2007, ordering that Financial Services Law Practice, PC, Matthew Benson, and William E. Wells were found in contempt and, for a sanction, they were jointly and severally liable for payment to the Trustee of the sum of $1,320, representing her reasonable attorney fees in this matter. Despite the fact that Wells and his firm were on notice of the importance of following appropriate procedures with regard to electronic signatures, it is apparent that Wells has not seen fit to take steps to avoid continuing violations of the necessary standard of care due his clients.

A good example of Wells' continuing violations is the Chapter 13 case of <u>Sanita Ann DiVietro, Case No. 07-30614</u>, also scheduled for hearing before this Court on June 22, 2007, the Chapter 13 Trustee discovered that an Amended Chapter 13 Plan had been filed by Wells' firm, which provided a monthly payment far in excess of the amount that the Debtor was told it would be. This Amended Chapter 13 Plan was filed containing the electronic signature of the Debtor, and it was revealed by the Debtor's shock at the Section 341 Meeting of Creditors that the amended plan had been filed without the Debtor's knowledge, consent, or authorization. As a result of this serious error, the Chapter 13 Trustee filed a Motion to Examine/Disgorge Fees against Wells and his firm, which was set for hearing on June 22, 2007. Wells failed to appear. However, Ms. DiVietro appeared. She indicated on the record that she had not signed the amended plan and that she had, in fact, received a phone call at 2:00 P.M. on June 21, from a "Jessica" at Wells' office telling her that Wells was sick, that the hearing was continued, and that the she did not need to appear. Uncertain of this information, the Debtor appeared, sensing the need to protect her interests on her own. As the record of the proceedings on June 22, 2007, reflects, there were no continuances of any cases having Wells and/or his firm as debtors' counsel. The Court further learned that, in addition to attempting to waive Ms. DiVietro off from attending the hearing on June 22, 2007, Wells, or someone on his behalf, contacted creditors' counsel in other hearings before

the Court indicating that he had obtained a continuance of those matters. No such continuances had been allowed, and this type of conduct is typical of the practice of Wells and his firm before this Court. Clear misrepresentations were made by Wells or someone on his behalf to both his own clients and to creditors' counsel. The Court cannot condone such conduct.

**Kathleen Scheel, Case No. 06-40653**

In February 2005, Debtor went to Wells firm for a consultation concerning her financial condition. At that time, Ms. Scheel was unemployed since she had been laid off from her long-standing employment with Maytag Company. Wells was advised that Ms. Scheel had at least $80,000 in debt, and that Ms. Scheel had an interest in an individual retirement account at Wachovia Securities. The Statement of Financial Affairs filed in Scheel's Chapter 7 case indicates that she received distributions from her individual retirement account at Wachovia Securities in the amount of $74,408.73, in 2005.

Kathleen Scheel entered into a retainer agreement with Wells' firm on February 4, 2005, under which Wells was to undertake debt negotiation with Scheel's creditors, and Scheel paid a retainer fee in the amount of $6,600 to Wells' firm. It has been Wells' position that Scheel removed the $74,408.73 in funds from her individual retirement account prior to the time when he was retained. The U. S. Trustee argues that Wells' position is not logical given that Scheel did not make an up-front payment of sufficient money to allow Wells' to begin negotiations on debt settlement. Rather, Scheel paid the funds piecemeal, with one payment to Wells in the amount of $15,000, as late as August 3, 2005, made with a check signed over from the holder of Scheel's individual retirement account, Wachovia Securities. While the Court finds that the position taken by the U. S. Trustee as to the time line of Scheel's payments to Wells is the most logical and credible, it also finds that, regardless of which time line is correct, the representation provided to Ms. Scheel by Wells and his firm was incompetent.

The uncontested facts reveal that Kathleen Scheel paid a total sum of $34,500 to Wells to be used to attempt a negotiation and settlement of all of her debt. These funds would have been totally exempt from Scheel's creditors had they been left in her individual retirement account. Wells received a total up-front attorney fee in the amount of $6,600 in early 2005, and did not begin to negotiate settlement of any of Scheel's debts until January 4, 2006, when he settled three accounts with Chase, for the sum of $9,212. These debts to Chase were dischargeable debts that were paid with funds that should have been exempt retirement money. No other debts were settled. As a result, on June 27, 2006, Wells filed a Chapter 7 bankruptcy petition on behalf of Kathleen Scheel. Schedule F of Scheel's bankruptcy petition indicated that, even with the debts that had been settled by Wells, she still had in excess of $88,000 in unsecured debt. Additionally, Ms. Scheel was unemployed, had lost the protection of the exemption in her individual retirement account, and was overall in worse financial distress than when she first consulted with Wells in February 2005.

Regardless of when Kathleen Scheel withdrew the funds from her individual retirement account, the uncontested facts clearly establish that Wells' representation of her was not competent. No competent attorney would even suggest to attempt to negotiate debt settlement using exempt funds to pay debt that would be dischargeable in a bankruptcy proceeding. A competent attorney would have made every effort to protect the funds in Scheel's individual retirement account, and would have advised the Debtor to replace any funds in the retirement account which might have been withdrawn by Scheel prior to consultation. Wells' incompetent services provided no benefit to Kathleen Scheel. Rather, those services were detrimental to her interests. Wells was ordered to disgorge the sum of $5,850 to Scheel's Chapter 7 bankruptcy estate by a prior Order entered by this Court on May 7, 2007.

**Anthony Chambliss, Case No. 06-40802**

From May 26, 2005, through May 31, 2006, Anthony Chambliss paid a total of $7,100 to Wells and his firm for the purpose of negotiating settlement of his debts. Out of this sum, Wells received fees in the amount of $4,349. None of Mr. Chambliss' debts were settled by Wells or his firm, and, on August 9, 2006, Wells firm filed a Chapter 7 bankruptcy petition on behalf of Mr. Chambliss.

When Mr. Chambliss' Chapter 7 petition was filed in August 2006, it was revealed that Mr. Chambliss had virtually no secured debt and his unsecured debt, in excess of $58,000, was mostly for credit card charges. In a letter, dated October 31, 2006, from Mr. Chambliss to Chapter 7 Trustee Cynthia Hagan, Mr. Chambliss related that, in the two years prior to his bankruptcy filing, he had had pancreatitis, was in and out of the hospital three times, had surgery, had blood clots, and that he was battling diabetes. As a result, he had lost over 160 pounds. Given Mr. Chambliss' medical condition and the amount and unsecured nature of his debt, it is unimaginable that any competent attorney would have proposed an attempt at debt negotiation outside of bankruptcy. In fact, after deducting the amount of Well's fee, there wasn't even enough money left over for debt negotiation to settle Mr. Chambliss' debts for 10 cents on the dollar. Wells provided no benefit or value to Mr. Chambliss in the form of debt negotiation services, although he did provide a benefit to Mr. Chambliss in that a Chapter 7 discharge was entered in Mr. Chambliss' favor on December 4, 2006. For this benefit, Wells claimed attorney fees of over $4,000, which he could not possibly justify. In this regard, Wells was ordered to disgorge the sum of $3,300 to Mr. Chambliss' Chapter 7 bankruptcy estate by prior Order of this Court on May 7, 2007.

### Johnson's Siding & Replacement Windows, Inc., Case No. 06-41008

On September 22, 2006, Wells filed a Chapter 7 bankruptcy petition on behalf of Johnson's Siding & Replacement Windows, Inc. On October 10, 2006, Wells filed a Disclosure of Compensation indicating that he had received no fees from the Debtor Corporation. Additionally, the Statement of Financial Affairs filed in Johnson's case in

11

October 10, 2006, by Wells, indicated that no payments had been received from the Debtor for any debt counseling service.  At the Section 341 Meeting of Creditors, Trustee Dana Frazier learned that the Debtor had, in fact, paid Wells and Financial Services Law Practice, PC, the sum of $10,000 for credit counseling services, as evidenced by a Retainer Agreement signed by Brian Johnson, the Vice President of the Debtor Corporation, and William Wells, dated September 16, 2005.  The Retainer Agreement indicates that the retainer of $10,000 represented an attorney fee of $10,000.  It was the testimony of Debtor's officers that the credit counseling service offered by Wells and his firm was retained to attempt to negotiate a debt settlement with Creditor, American Wholesalers, Inc.  The debt was not settled, and, subsequently, American Wholesalers, Inc., obtained a judgment against the Debtor.  Armed with this information, Trustee Frazier filed a Motion for the Determination of Reasonable Value of Services, pursuant to 11 U.S.C. § 329(b) and Federal Rules of Bankruptcy Procedure 2017.  Although he was called upon to do so, Wells has never produced a single document or pleading detailing an itemization of the time that he allegedly spent earning a $10,000 fee.  As such, on April 23, 2007, the Court entered an Order requiring Wells and Financial Services Law Practice, PC, to disgorge the sum of $9,000 to the Chapter 7 bankruptcy estate of Johnson's Siding & Replacement Windows, Inc. In addition to his failure to ever justify his fee, the Court finds that Wells filed a false Disclosure of Compensation and a false Statement of Financial Affairs, in that neither document addressed the $10,000 retainer fee.

### Charles Burnham and Kimberly Burnham, Case No. 06-41087

The Burnhams are a family of three, with a five-year old daughter at home.  The schedules filed with their Chapter 7 bankruptcy petition by Wells on October 15, 2006, indicate that the Burnhams consistently have an annual income under $50,000.  The Burnhams have a home with a first and second mortgage and unsecured Schedule F debt in excess of $43,000.  In November 2005, the Debtors consulted with Wells' firm to discuss

their financial condition, and they entered a Retainer Agreement with Wells' firm under which they paid up-front attorney fees of $3,060 to cover credit counseling, credit correction, and settlement negotiations with creditors.  Following payment of the up-front attorney fees, no debts were settled through debt negotiation, and the Chapter 7 bankruptcy petition was filed nearly one year after the Burnhams first met with Wells.  The Disclosure of Compensation filed by Wells, together with the Debtors' original Chapter 7 bankruptcy petition indicates that Wells received no funds in fees from the Debtors and that there was no balance due.  The Statement of Financial Affairs filed by Wells with Burnhams' original Chapter 7 petition did reveal that sums in excess of $3,000 were paid by the Burnhams to Financial Services Law Practice, PC, with a statement indicating that all funds went for debt negotiations/settlements and that the contract between the parties called for representation by Wells and his firm in a Chapter 7 at no additional charge.  As stated above, there were no debt settlements.  Thus, the sums in excess of $3,000 went solely for attorney fees for Wells and his firm.

In addition to their being no justification for a fee in excess of $3,000, the Court would note that, during the time that Wells was retained to negotiate debts and at the time that the bankruptcy case was filed, the Burnhams were sued by a medical provider for unpaid medical bills.  Given this fact and the uncontroverted financial information contained in the Burnhams' Chapter 7 petition, it is clear that no competent attorney would have ever suggested an attempt to negotiate settlement of the Burnhams' debts.  The only benefit and value to the Burnhams provided by Wells and his firm was the Chapter 7 discharge awarded to the Burnhams on January 31, 2007.  This being the case, the Court entered an Order on May 7, 2007, ordering William Wells and Financial Services Law Practice, PC, to disgorge the sum of $2,316 to the Burnhams' bankruptcy estate with the finding that the reasonable value of the services provided by William Wells and Financial Services Law Practice, PC, was $750.

The lack of competency and the ethical violations by Wells are not limited to the cases captioned in this Opinion.  Wells and his firm have several hundred cases currently pending before this Court, and a review of those cases reveals further evidence of incompetency and ethical violations.  The Court finds that a discussion of a select few of those cases serves to further illuminate the extensive scope and serious nature of this matter.

### Shawn and Cheryl Davis, Case No. 06-41081

On October 12, 2006, Wells, through Financial Services Law Practice, PC, filed a Chapter 7 bankruptcy petition on behalf of the Davises.  In his Disclosure of Compensation included in Debtors' original Chapter 7 petition, Wells disclosed that he received a fee in the amount of $700 from the Davises prior to filing their Chapter 7 petition.  The Statement of Financial Affairs, filed as part of the Davises' petition, also listed a payment of $700 to Financial Services Law Practice, PC, in response to question No. 9 on the Statement.  At their Section 341 Meeting of Creditors, the Debtors testified that they had actually paid the sum of $2,000 to Wells, rather than the sum of $700 set out in Wells' Disclosure of Compensation and in the Statement of Financial Affairs.  On March 29, 2007, Chapter 7 Trustee Cynthia Hagan requested documentation concerning the amounts that had been paid by the Debtors to Wells.  In response to this request, Wells advised the Trustee that the records necessary to provide this documentation were missing from his office.  To this date, an accounting has not been provided by Wells, nor has he provided any explanation of the false statements made in his Disclosure of Compensation and in the Debtors' Statement of Affairs.  The Court would note that the Debtors have received a $400 refund from Wells, but that still leaves Wells with an attorney fee of nearly $1,300 for the filing of a routine Chapter 7 bankruptcy petition.

### Patricia Frahock, Case No. 06-40720

In its Brief and Memorandum in Support of Suspending Attorney from Practicing in Bankruptcy Court, the United States Trustee's Office eloquently sums up the tragedy of Ms. Frahock's case as follows:

> As mentioned in the discussion of the Kathleen Scheel case, this is a case where the debtor never should have been given the opportunity to participate in Wells' debt negotiation services. A competent attorney would not have recommended such a course of action and if the client would have insisted on pursuing such a course of action, a competent attorney would not have represented the client. A competent attorney would have foregone the opportunity to earn a fee and passed on the representation.

Wells did not choose the competent path.

On or about April 16, 2004, Patricia Frahock entered into a Retainer Agreement with Wells wherein he agreed to negotiate settlements with her creditors and to perform a credit correction. Ms. Frahock advised Wells that she was seeking to negotiate settlements on approximately $26,390 in debts. Frahock paid the sum of $510 toward the attorney fees, which, per the Retainer Agreement, had to be paid in full prior to Wells' attempting to settle her debts. Having lost her husband in 2002, she worked various odd jobs in 2004 and 2005, earning a gross income between $9,000 and $10,000 annually. In addition to the income she received from her jobs in 2004 and 2005, she received funds from Metlife in the amount of $23,733.70, over the time period of April 2004 to July 2006. At the time her Chapter 7 bankruptcy petition was filed on July 19, 2006, over two years after her initial consultation with Wells, the Debtor was receiving only Social Security income of $1,097 per month and pension income of $676, giving her a total gross monthly income of $1,773.

Able to make only periodic payments on the up-front attorney fees, it took Ms. Frahock until November 29, 2004, to pay the entire $2,575.25. Once the attorney fees were made, Ms. Frahock made payments to Wells in an attempt to accumulate a fund with which to negotiate a settlement with her creditors. On August 5, 2005, a settlement was reached through Wells' efforts settling a debt of $7,862.41, to MBNA America for the sum of $1,572.48. As the United States Trustee points out, this is a good result, being a settlement

15

of approximately 20 cents on the dollar; however, no other debts were settled, resulting in the necessity to file a Chapter 7 bankruptcy petition.

In addition to the deplorable representation and advice Wells provided to Ms. Frahock, the Court would note that, in his Disclosure of Compensation, filed with the original Chapter 7 bankruptcy petition, Wells' firm discloses a fee of only $399. This same disclosure is made at Item 9 of the Debtor's Statement of Financial Affairs, further indicating that the payment disclosed was made on or about April 16, 2006. Both of these documents contain false statements that have never been corrected or even addressed.

### Anna Stratton, Case No. 07-40381

On August 19, 2005, Anna Stratton entered into a Retainer Agreement with Wells' firm to perform debt negotiation services. Ms. Stratton was charged fees in the amount of $1,446, with $846 of that being for debt negotiation services on her then total debt of $11,285, and $600 for credit correction services. Ms. Stratton paid the sum of $3,334 at the time of the signing of the Retainer Agreement. Thus, the attorney fees were paid in full, and Wells had some funds to begin debt settlement negotiations. The chronology of events leading up to Ms. Stratton's Chapter 7 bankruptcy filing on March 23, 2007, cannot be determined due to Wells' claim that Ms. Stratton's file is missing from his office and cannot be located. To date, Wells has not submitted any evidence, such as bank records or accounting records that would show the safeguarding and keeping of Ms. Stratton's funds that should have been accumulated for the purpose of debt settlement negotiations.

At the time of her Chapter 7 filing, on March 23, 2007, Ms. Stratton's schedules indicated that she was a divorced mother of two minor children, having a net income of only $2,089.11 per month, with Schedule F unsecured debts in excess of $12,000, and Schedule D secured debts of nearly $60,000. Given Ms. Stratton's undeniable financial scenario, there was absolutely no basis for pursuing pre-bankruptcy debt negotiation. The Court finds it unconscionable that, despite fees being paid in full together with other funds, nothing was

done on Ms. Stratton's behalf from August 19, 2005, until the Chapter 7 petition was filed on March 23, 2007.  Additionally, the Court would note that the information provided by Wells on his Disclosure of Compensation and in Item 9 of Debtor's Statement of Financial Affairs is false, and no action has been taken by Wells or anyone on his behalf to address or correct the false information provided.

**Dennis M. Morgan, Case No. 07-40555**

While Dennis Morgan's Chapter 7 bankruptcy case, filed on April 26, 2007, does not involve pre-bankruptcy debt negotiation services, it serves as an example of the poor condition that many of Wells' cases are in.  As set out in a May 30, 2007, letter from Chapter 7 Trustee Dana Frazier to Wells' law practice, Morgan's bankruptcy petition and schedules were fraught with various errors and inconsistencies.  On its own, the Morgan case would not support an order suspending Wells from practice before this Court, but, when taken with the many like it and those cases with far more serious deficiencies discussed herein by the Court, there is no room left for doubt as to the decision which must be made concerning Wells.

Matters concerning certain pending cases of Wells that transpired as recently as July 9, 2007, clearly reveal that Wells' failings in his practice before the Court are not historical, as he would have the Court believe.  On July 9, 2007, seven of Wells' cases were on the Court's docket.  Wells did not appear in any of the seven cases scheduled on the Court's 9:00 A.M. docket, but, rather, through his counsel, Spencer Desai, faxed the Court a letter attempting to explain his absence and the status of the cases that were on the Court's docket.  The faxed letter was not received until the afternoon of July 9, 2007, well after all hearings on the Court's docket had been concluded.  Wells' absence at the scheduled hearings was based upon Wells' belief that he had already been suspended from practice before this Court as a result of the June 22, 2007, hearing wherein the Court prohibited him from filing any new cases.  A review of the transcript of the June 22, 2007, hearing and of the Minutes

17

of Court reveals no ambiguity and no basis for Wells to assume that he had yet been suspended from practice. Wells' own conduct in this regard reveals that his excuse is disingenuous. While Wells did not appear in Court because he believed that he had already been suspended from practice, he continues to contact creditors and reach agreements, where possible, which in this Court's view are clearly acts of practicing law.

The facts recited by the Court above speak for themselves. William E. Wells has violated the Standards of Professional Conduct and the Rules of Professional Conduct adopted by the Supreme Court of Illinois in his practice as an attorney before this Court on many occasions. Wells has provided incompetent legal representation and advice. He has charged and collected fees far in advance of the value of the services which he has rendered. He has demonstrated an inability to be candid and forthright in the representation of his clients and in his dealing with the Standing Trustees, the United States Trustees, opposing counsel, and the Court. He has filed false pleadings, and, given the extensive scope and number of ethical violations, the only way that the Court can ensure the integrity of the system and protection of innocent would-be clients is to suspend William E. Wells and any other entity that he may control or be related to from further practice before this Court. Additionally, the Court must refer this entire matter to the Office of the United States Attorney and the Illinois Attorney Registration and Disciplinary Commission.

The burden which Wells' continued conduct has placed on the Trustees, creditors' counsel, and the Court pales in comparison to the damage and disservice he has done to his clients. To allow him to continue to practice before this Court in any manner whatsoever would be a travesty.

ENTERED: July  18 , 2007.

/s/Gerald D. Fines
GERALD D. FINES
United States Bankruptcy Judge